Vallé et al. v. Cerré's Adm'r.

————◦ ◦ ◦◦ |————

JOHN B. VALLÉ *et al.*, Plaintiffs in Error, *v.* M. S. CERRÉ'S ADMINISTRATOR, Defendant in Error.

| 36 | 575 |
| 44a | 502 |
| 36 | 575 |
| 114 | 665 |
| 36 | 575 |
| 133 | 448 |
| 36 | 575 |
| f84a | 425 |
| 84a | 426 |
| 86a | 507 |
| 86a | 509 |

1. *Practice—Parties.*—In an action, for the delivery of personal property, against the sheriff, it is proper to allow the parties interested with the sheriff to be made co-defendants, that they may defend the action and protect their interests.

2. *Bill of Exchange—Acceptance.*—A written contract to accept a non-existing bill of exchange, must point to the particular bill and describe it in express terms. (R. C. 1855, p. 293, § 3.) A general letter of credit is not an acceptance of a particular bill; but a party taking a bill upon the faith of such letter can maintain an action against the promissor to recover the amount advanced.

3. *Practice—Instructions.*—An instruction which refers a matter of law to. the jury is erroneous.

4. *Contract—Letter of Credit—Bill of Exchange.*—A. at St. Louis gave to B. at New Orleans a letter of credit, authorizing B. to draw bills of exchange predicated upon actual shipments made to A. to the amount of three-fourths of the value of such shipments. *Held,* that such letter was a general authority, and was to be construed most strongly against the giver of the power ; and that a banker, taking a bill thus drawn, could not be required to look beyond the letter of credit, the invoice, and bill of lading, to determine whether B. had exceeded his power by drawing for a larger amount than he was authorized.

5. *Contract—Consignee—Lien—Bailment.*—A. at St. Louis made an arrangement with B. at New Orleans mutually to consign produce to each other for.

sale, B. being authorized to draw bills of exchange for three-fourths of the value of the shipments made by him, the proceeds of sales to be carried to general account. In the course of business, there was a balance of ten thousand dollars in favor of A. upon general account. B. subsequently made a shipment to A. and drew his bill of exchange predicated upon such shipment, and transferred the bill to C., a banker, showing him the letter of credit, the invoice and bill of lading for the goods shipped. C. advanced to B. part of the amount for which the bill was drawn. *In transitu,* the goods shipped were attached by a creditor of B. A. received the bill of lading and invoice two days before the goods were attached. After the attachment the bill of exchange was presented to A. at St. Louis for acceptance, which was refused. A. subsequently replevied the goods in the hands of the sheriff, and after suit commenced paid C. the amount advanced by him and received the protested bill. *Held,* that A. had such a lien upon the goods that he was entitled to maintain his action, and that his title was better than that of the attaching creditor.

### Error to St. Louis Circuit Court.

The facts are stated in the opinion of the court.

At the instance of the plaintiffs, the court gave the following declaration of law:

"If the court, sitting as a jury, finds that the plaintiffs wrote the note—the letter to Titus, dated June 21, 1859" (the letter of credit authorizing Titus to draw for three-fourths of the value of actual shipment), " which was read in evidence—that Titus received this letter prior to 6th August, 1859 ; that he thereupon shipped to the plaintiffs at St. Louis, on the steamboat Gladiator, the 300 sacks of coffee in the petition mentioned ; that the bill of lading read in evidence was taken for said shipment ; that thereupon said Titus drew the bill of exchange read in evidence, which he exhibited to Kentzen & Co. with the bill of lading, and the invoice of said coffee read in evidence, and also the said letter of the 21st of June, 1859, and that on the faith of said letter which was shown to them, said actual shipment, and said bill of lading, the said Kentzen & Co. advanced $2,000 on said bill of exchange and took the same in good faith ; that the said bill of exchange was drawn in conformity to the authority contained in said letter of the 21st June 1859, and that the said bill of lading was received by plaintiffs on the 11th August,

1859, then the plaintiffs are entitled to the possession of the coffee and ought to recover in this action."

Which the court gave, the defendant duly excepting at the time.

The defendant asked the following instructions:

1. The letter of J. B. Vallé & Co. to Titus, dated 21st June, 1859, and read in evidence, as the promise to accept is not an unconditional promise to accept the bills drawn by Titus, and the party taking any such bill must at his peril see to the performance of all the conditions prescribed by Vallé; if the bill be for more than three-fourths of the value of an actual shipment, no matter what deception is practised upon the person with whom the bill is negotiated, there is no obligation on Vallé & Co. to accept or pay any part of such bill.

2. If the coffee in controversy was worth both in New Orleans and St. Louis, at the time when it was shipped on the Gladiator, less than $5,400, then Vallé was not bound by his letter of credit to pay or to accept any bill, or any part of any bill, drawn against the same for more than $4,050.

3. If the court, sitting as a jury, should be of opinion that Vallé & Co. were bound by their letter of credit to pay the sum of $2,071.11 which had been advanced by Kentzen & Co. on the draft of $4,200.11, then, the coffee having been taken on attachment at the suit of Thos. L. Clark & Bro. as the property of Titus, the possession of the sheriff was lawful, and Vallé cannot take it out of his possession merely to enforce a lien for $2,071.11.

4. That this right of lien of Vallé does not authorize him to take possession of the coffee as against the attaching creditor, who is a purchaser for a valuable consideration.

5. That if Vallé had a lien of $2,071.11 against the coffee, he should have entered his appearance as a party to the attachment suit of Clark & Bro. v. Titus, setting forth his lien and claiming that so much of the proceeds of the coffee as would reimburse him for the $2,071.11 should be paid over to him, and he cannot recover in this action.

6. That in case of the coffee not being sold, but merely consigned for sale, the general property remained in the consignor Titus till it reached Vallé's possession; and that if, before reaching his possession, it was attached by a creditor of Titus, then that general property was vested in the sheriff by the levy, and Vallé cannot, by virtue of a special property, recover in this case and take the coffee out of his possession.

All of which instructions the court refused, the defendant duly excepting thereto at the time.

*T. T. Gantt*, for plaintiffs in error.

I. The plaintiffs in error, for Thos. Clark & Bro., are the real parties in interest, and Cerré was merely their trustee; complain of the refusal of the court below to allow them to be made co-defendants in form.

II. The instructions given assumed as facts several matters which are not facts. Kentzen & Co. did not, on taking the bill, advance $2,000.11 on it; they refused to do this until they should learn that Vallé had accepted the bill, and they only receded from this position on the 11th August, 1859, yielding to the importunity of Titus. Vallé & Co. allowed this bill of exchange to be protested for non-acceptance on the 15th August, 1859, and for non-payment on the 27th August; they did not get possession of the bill until October, 1859, some two months after this suit was commenced.

The instruction refers to the triers of the fact the ascertainment of the matter of law: "If the court, sitting as a jury, finds that the bill of exchange was drawn in conformity to the authority contained in said letter of 21st June, 1859," &c. (Butcher v. Death et al., 15 Mo. 271.) It was the duty of the court to say whether it was so drawn, the facts being conceded; or to tell the jury to find that it was so drawn, if certain facts were by them ascertained to be true.

This instruction is otherwise defective and vicious. It gives prominence to the matter of good faith on the part of Kentzen & Co. in the negotiation of the bill of exchange. If the bill was in conformity with the letter of credit, it

was already accepted; of this there can be no question either at common law or on our own statute, and therefore the only ground of hesitation must have been that they perceived, or that at least they feared, the conditions of the letter of credit had not been complied with.

The court having failed to interpret the letter of credit in the instruction given at the instance of the plaintiffs below, the defendant endeavored to supply the omission and correct the error thus existing; and to this 'end the two first instructions were asked. These contained a correct exposition of the law, and should have been given. The letter of Vallé dated 21st June, 1859, clearly was not an unconditional promise to pay all bills drawn by Titus, on shipment to his house, but only bills for three-fourths of the value of such shipment. This letter of credit was shown to Kentzen & Co., and they were admonished, by its terms, of the qualified character of Vallé's undertaking.

The rule of law in this, as in most cases, is the rule of common sense. The authority to draw bills must be strictly pursued. The person promising to honor bills of a certain description, is not bound by that promise to pay bills of a different description; this is illustrated by repeated decisions on this subject. Titus was, by the letter of credit, authorized to draw bills in conformity with its provisions. These Vallé was bound to honor; but he was not bound to accept or to pay, in whole or in part, any bill drawn in disregard of these provisions. (Reed v. Wilkinson, 2 Wash. C. C. 514; Anderson v. Hick, 3 Camp. 179; Storer v. Logan, 9 Mass. 55.) These authorities are in point; they show that, at the time this suit was brought, Vallé had no right to the consignment. He had, on the 15th August, 1859, refused to accept the bill drawn on it; on the day after this suit was commenced, he refused to pay it. He had, then, repudiated all claim as consignee, unless by reason of the letter of credit he was already liable as acceptor: he was wholly unconnected with this coffee; for it would be quite as violatory of legal rules as of common sense to allow

Vallé to repudiate the *onus* while snatching at the *commodum*. *Qui sentit commodum, sentire debet et onus*, is the legal maxim. This matter has been the subject of judicial examination elsewhere; and it has been expressly decided that if a consignee allows a bill drawn on a shipment to be dishonored, he has no right to the possession of the shipment. (Allen v. Williams, 12 Pick. 297; Kinlock v. Craig, 3 Term. 119; Waller et al. v. Ross et al., 2 Wash. C. C. 282; Ryberg et al. v. Snell, 2 Wash. 294.)

Vallé & Co. could only assert a right to the possession of the coffee by reason of having made some advance, or incurred some liability, in respect of this very coffee. They had made no such advances; had repudiated all liability in respect of the bill drawn on account of it; and, as has been shown, were not liable in respect of their letter of credit. They had, then, no right of action, and defendant is entitled to judgment for the return of the property. (Mason v. Barff, 2 Barn. & Ald. 33—Judge Bayley's opinion, on the point of the strictness with which an authority to draw bills is to be construed.) If, in any particular disadvantageously to the drawee, the authority be departed from, the drawee is not liable.

It has been stated that Vallé & Co. were creditors of Titus, on general account, independent of this coffee, in the sum of ten thousand dollars, or nearly. It is not intended to dispute the legal proposition, that a factor may retain, or has a lien on property in his possession, on account of a general balance.

*Glover & Shepley*, for defendant in error.

I. The instruction given for the plaintiffs was correct. (1 R. C. 1855, p. 293, §§ 1, 2, 3, 4 & 5.) The letter of June 21, 1859, was an unconditional promise to pay a bill drawn in conformity thereto. The bill drawn was in accordance with the instructions; it does not appear that the $4,200 was more than three-quarters the value of the coffee in New Orleans. It does appear that an invoice of the cof-

Vallé et al. v. Cerré's Adm'r.

fee was delivered to Kentzen & Co., in amount $5,688.18. This sum embraced the amount paid T. L. Clark & Bro., also, drayage and insurance; these several items made up the cost of the coffee to Titus. He represented $5,688.18 as the value against which he drew the bill for $4,200.11. No witness has shown the coffee to be worth more or less than the invoice made out by Titus; what Titus paid for the coffee is not necessarily the full value; the instructions left it in the first instance to Titus to say what was three-quarters the value of the shipment; he said $4,200.11, and this should be regarded as correct until some proof is brought that it is not; no such proof has been brought. The bill being drawn by Titus in good faith, and in conformity to the letter of credit, and being negotiated for value, Vallé was bound to pay it. Vallé must be considered, then, as having advanced so much money on the consignment for Titus; Vallé thereby became a purchaser of the coffee, a vendee *pro tanto.* This vested in him a legal title to the coffee until the money paid by Vallé to Kentzen & Co. was repaid. In fact, this is conceded as the law of the case. (12 Pick. 297; 2 Barn. & Ad. 932; 2 Wash. C. C. 403; 6 Serg. & R. 429; 2 Bing. 20; 4 East. 211; 1 Ld. Raymond, 271; 3 Paige, 373; 26 Wend. 369; 24 Wend. 174; 3d Term, 119.)

In the last quoted case the court say, a factor who makes advances on a consignment is a purchaser, and has all the rights of a vendee; that Vallé, knowing of the failure of Titus, and not knowing of the negotiation of the bill, declined to accept, or pay, is nothing; he had accepted prior to the drawing of the bill, was bound on the bill, and compelled to take it up; which he did. This gave him a lien on the consignment for the bill, and of course the legal title and right to possession. Factor liens secure the legal title.

II. But the court might have laid down the law more advantageously for the plaintiffs. Vallé held a debt against Titus for $10,000.11, incurred in regular and continuous dealing, as principal and agent on account of advancements by Vallé. This consignment was, under the facts in evidence,

independent of the Kentzen & Co. bill for that balance. Actual possession of the coffee was not necessary to the attaching of this lien; if, in making the consignment, Titus indicated an intent to pass the title to Vallé, then the lien for this general balance, with legal title and right of possession, rested in Vallé & Co. *eo instanti* that the goods were delivered to the carrier. (Russell on Factors, 45; Law Lib. 202.) Such intent is very manifest; the bill of lading was not in the shipper's name, but in the name of John B. Vallé & Co.; coffee to be delivered to them, they paying freight. This passed the title and right of possession. (1 Ld. Raym. 271; 3 Paige, 373; 1 Binney, 106; 5 Ham. 88; 2 Burgh, 20; 4 Scott, N. C. 43; 1 Bos. & Pul. 536; 4 Mee. & W. 775; 17 Mass. 197; 4 Scott, N. R. 43–53.) Delivery to common carrier is such passing the property out of possession and control of seller as vests title in consignee, subject to right of stoppage *in transitu.* (1 Pars. on Cont. 443; Sto. on Sales, 355—§ 311, *a. b.*—§ 312, *a. b. c.* & notes.)

There was no need of any endorsement on the bill of lading, because the goods were passed by the words on the face; Vallé's rights were the same as if the bill of lading had been in the name of Titus or his assigns, and by him endorsed in blank. The bill of lading had been placed in Vallé's hands before the attachment; this was constructive delivery; and as *prima facie*, it was an absolute title in Vallé. The right to hold for the general balance is made out. To suppose Titus did not intend to pass the property of the whole shipment to Vallé would be unreasonable.

HOLMES, Judge, delivered the opinion of the court.

This case was affirmed at the March term of this court, 1864, and a re-hearing was granted at the same term. The reasons for the decision were somewhat briefly stated, and in such manner as to lead to the supposition that the case had not received that careful consideration on some points which the importance of the questions involved, might seem to demand. It has been re-argued with much learning and abil-

ity, and we have given the subject the most attentive delibe-
ration.

The case may be stated in substance as follows: The plain-
tiff, a merchant of St. Louis, and one A. Titus a merchant
of New Orleans, were transacting business with each other,
as factors and commission merchants, the former shipping
produce to New Orleans, and the latter shipping groceries to
St. Louis, to be sold on commission and the proceeds placed
to account, or as purchases to be charged in account, under
a special arrangement and mutual understanding between
them, that such business relations should be continuous for
an indefinite time; that the plaintiff should buy and forward
produce to Titus at New Orleans, receiving a commission
and drawing bills against the shipment, or charging the
amount to the credit of the other in account, and that Titus
should make consignments of sugar, coffee, and molasses, to
be sold on commission and account, on which the consignee
at St. Louis was to make advances within the limit of a gen-
eral letter of credit authorizing the consignor to draw and
negotiate bills on the consignee, against the shipments made,
to the extent of three-fourths of their value, at five or ten
days' sight, preferring ten, when the shipments were made.
This business had continued for about four months, when, on
the eleventh day of August, 1859, there was a balance of
account due the plaintiff amounting to $10,000, for advan-
ces already made in the course of the business. On the 6th
day of August, by bill of lading of that date, Titus con-
signed to the plaintiff 300 sacks of coffee, and delivered the
goods on board the steamer " Gladiator," bound for the port
of St. Louis.

He addressed a letter to the consignee, enclosing the bill
of lading, in which he was named as consignee, dated Aug.
8, 1859, and the invoice of same date, showing 300 sacks of
coffee, 48,919 pounds, at $11\frac{1}{2}$ cents per pound (with insur-
ance and drayage), amounting to $5,688.18, informing him
of the consignment, and saying he had drawn against it for
$4,200 at five days' sight; that it was a good article and he

hoped he would get a good price for it, and would honor his draft, and the next day wrote another letter, saying he had drawn the draft at ten days' sight, the better to suit his convenience. It appears that the 300 sacks arrived at St. Louis, contained 423 pounds less than the invoice, and it was agreed on the trial that the coffee was worth at St. Louis, in August, 1859, 11 cents per pound, and for 48,919 pounds (less freight) amounted to $5,308.09, and at this calculation the draft was drawn for some $250 more than three-fourths of the value. On the same day (August 8th) Titus negotiates the draft to Kentzen & Co., bankers at New Orleans, showing them the letter of credit, (dated June 21, 1859,) the bill of lading and the invoice, who thereupon agreed to take the draft, but declined paying over the money on it until they should hear it was accepted; but a few days afterwards (August 11), upon the urgent solicitation of Titus, paid him $2,000 on account of it. The next day Titus failed and absconded. On the 11th day of August, the plaintiff received the letter enclosing the invoice and bill of lading. Two days afterwards (August 13), the coffee was attached and seized on board the· "Gladiator," lying at quarantine, ten miles below St. Louis, at the suit of T. L. Clark & Bro., merchants of New Orleans, as the property of A. Titus, the defendant therein; and it appeared that Titus had bought this coffee of Clark & Bro. on the 6th day of August previous, on a credit of two months, and given his note for the purchase money and interest, amounting to $5,315.49, for which sum they sued. Afterwards, on the 26th of August, the plaintiff brought this suit and replevied the coffee out of the hands of the sheriff. On the 19th of August the draft was protested for non-acceptance, and on the 27th for non-payment; but in October following, the plaintiff paid Kentzen & Co. the amount of their advance and interest, and took the draft. T. L. Clark & Bro. asked to be made co-defendants with the sheriff and their application was refused. Any person may be a defendant who claims an interest in the controversy adverse to the plaintiff. (Prac. Act, R. C.

1855, p. 1218, § 4.) These claimants were not necessary parties; a complete determination of the matter in controversy may be had without them.

The old action of replevin could be maintained against the sheriff alone in such cases; it is founded upon his wrongful act. He must defend the action here; but the ultimate interest in the result concerns the plaintiffs in the attachment suit more than it does him. We think it would have been very proper for the court to have allowed them to be made co-defendants.

The main question is of the right of property as between the consignee and the attaching creditor; and in order to determine their rights, the matter is to be considered as it stood at the date of the attachment. And the first inquiry is, whether the plaintiff had acquired any lien or property in the goods consigned. He had received the invoice and bill of lading, and the shipment was made, and the goods delivered to the carrier, in pursuance of the arrangement that existed between the parties. The matter is to be considered with reference to this arrangement and the previous dealings of the parties with one another. It is not to be confined to this particular consignment alone, as a separate and independent transaction, standing by itself; in which case, the result might be quite different. It was a part of the arrangement, and evidently well understood by both parties, that the consignee at St. Louis was to make advances on the shipments made to him, and that the proceeds should be placed to the credit of the consignor in account to cover such advances and the general balance of account between them.

The authority to draw bills for those advances, before the arrival of the goods shipped, was limited to three-fourths of the value of the shipment in each particular instance; but it is also plain that the balance of the proceeds of each shipment, over and above the bill that was authorized to be drawn against it, was to be credited in account, and the shipments were intended to be made, and were made, not only to re-

pay the particular advance or acceptance thus made on that shipment, but also to cover any previous advances and the general balance of account that might then be standing against the consignor. This balance had accrued on the faith of this course of dealing, and of such future consignments, and amounted to ten thousand dollars. The consignor did not claim to have any right to draw for more than three-fourths of the value of that particular shipment, and the draft was apparently intended to be drawn in pursuance of the agreement and the letter of credit. That such was the arrangement and understanding of the parties and such the nature of the transaction, would seem to have been well established by the evidence. On this state of facts, a jury would be well warranted in finding that the shipment had been made to cover advances and the general balance of account, and that the delivery to the carrier was a constructive delivery to the consignee, and vested in him a present lien and property in the goods consigned. It would be equivalent to a shipment and delivery to the carrier upon an order of the consignee for his own account; in which case, indeed, there would be, in general, a right of stoppage *in transitu* in the consignor, in case of the insolvency of the consignee, for the amount of the price, if not paid at any time before the goods came to hand; but in this case the shipment may be considered as paid for in advance, and in such case there can be no right of stoppage *in transitu*. (1 Pars. Merc. Law, 142.)

In general, the bill of lading alone vests in the consignee only a naked legal title, or a mere special property, the whole beneficial interest or general property remaining in the consignor; and in such case the consignee may maintain an action against a wrong-doer, or against the carrier if he fail to deliver the property according to the bill of lading, and he may transfer the property by an assignment of the bill of lading for a valuable consideration as the act of the consignor himself; but in the absence of any special agreement, arrangement, or implied understanding otherwise, he

has no actual property in the goods, nor any lien for expenses, or for a general balance of account, unconnected with the transaction, until the goods come into his actual possession.   (Sto. Ag. §§ 361–378.)

The consignor, in such cases, may himself transfer the property by assignment or delivery of one of the bills of lading to any other person, as for instance to his banker, with whom he negotiates his draft against the shipment, and that will vest the property in the assignee, even though the consignee receive a second bill of lading and the goods from the carrier, and endeavor to hold them to cover a general balance of account against the consignor, while at the same time refusing to accept his bill, because he had exceeded his authority, and was already largely indebted to him; and such was the case of Allen v. Williams (11 Pick. 297); for, in that case, it was the manifest intention of the consignor that the shipment should not go to the consignee, unless he first accepted the bill.   The delivery of the bill of lading and the goods by the carrier, being without authority, vested no title in the consignee, against an actual transfer of the property by the consignor himself, even though they had come into his possession; and accordingly, it was held that the matter of the previous dealings of the parties and the balance of account was wholly immaterial.   The conduct and acts of the consignor were utterly inconsistent with any supposition or intent that the consignment was to go to his credit on the general balance of account, in pursuance of any previous arrangement.   (Sto. Ag. § 378.)   There is nothing of this kind here.

The consignor had never attempted to change the destination of the consignment, or to transfer the property to another; he sent the bill of lading and invoice directly to the consignee, and delivered the goods to the carrier, with the intent that they should go to him; the acceptance of the draft was in no way made or intended to be a condition precedent to the vesting of the property in the consignee, nor was there any thing in the transaction which was inconsist-

ent with the subsisting arrangement, or with the apparent understanding and intent that the property in the goods should vest in him, nor with the idea that the whole proceeds should go to his credit or general account, as well to cover the balance of account as that particular draft. He had authority to draw, at that time, to the extent of three-fourths of the value of the shipment then made; and if the draft were drawn in conformity with the authority given, it would create a binding obligation on the consignee to accept the same when presented; and if there had been an actual acceptance by virtue of the letter, there would be no longer any room to doubt that a constructive delivery and possession of the goods had taken place, and a clear lien or right of property vested in the consignee. (Davis v. Bradley, 28 Verm. 118; Holbrook v. Wright, 24 Wend. 169; Bryan v. Nix, 4 Mees. & W. 775; Russ. on Factors, 203.)

Where acceptances have actually been given upon the faith of a consignment by bill of lading, there can be no doubt that the consignee acquires such a lien, or property in the goods, as no subsequent act of the conveyance can divest; such an acceptance is held to be an advance upon the particular shipment.

Where there has been no advance or acceptance expressly made upon the particular consignment, and the question is only of a general balance of account for previous advances, the case differs not so much in principle as in the evidence required to establish the lien. It matters not whether the lien for a balance of account arises by operation of law from the usage of trade, or from the positive and special agreement and understanding of the parties, (Sto. Ag. § 375,) and it may extend to all sums for which a factor has become liable as surety or otherwise for his principal, whenever the suretiship has resulted from the nature of the agency, or the express arrangement of the parties, or it has been undertaken upon the footing of such a lien. (*Ibid.* § 376.) Whether or not the given consignment is to be considered as made to cover a general balance of account, will depend

upon the special arrangements, agreement, and understanding of the parties; but where such an arrangement exists, and the consignment is made in pursuance of it, and there is nothing else in the case which is inconsistent with the hypothesis, the case would be governed by the same principle, and a delivery to the carrier will be considered as a constructive delivery to the consignee. (Russ. on Factors, 203 ; Clark v. Mauran, 3 Pai. Ch. 373; Bryan v. Nix, 4 Mees. & W. 791; Desha v. Pope, 6 Ala. 690 ; 3 Pars. Cont. 261 & n. w.) In such case the shipment and delivery of the goods to the carrier, under the bill of lading, amounts to a specific appropriation of the property with an intention that it shall be a security or a payment to the consignee for the advances he has made.

In Ryberg v. Snell, (2 Wash. C. C. 403,) the consignor had parted with his interest in the property before it came to the possession of the consignee; there was no proof of any special arrangement or agreement, and a lien for a general balance of account was denied; but the principle was recognized, that if the consigment to the factor had been founded upon any special contract, which vested in him a legal title to the property, or if it had been made " in consideration of advances made, or arrangement entered into, on the faith of the consignment or the like," the case would have been different. It might be said that the advances here were not specially made upon the faith of this particular consignment, but they were made on the faith of this as of all future consignments which should be made in the regular course of their special business, and in pursuance of the arrangement which they had entered into concerning it ; and so, it may very well be said, that the advances were made on the faith of this consignment among the rest. It was intended within the scope of the arrangement and fell under the implied contract, resulting from their course of business and the previous dealings between them. (Sto. Ag. § 355.) There was nothing in the conduct of the consignor which was inconsistent with this view of the mat-

ter. He had parted with all his right of property and with all claim upon the goods. He acted in pursuance of the previous arrangement and in accordance with it; and it may very well be inferred that such was his intention also, and that when he had forwarded the invoice and bill of lading and delivered the goods to the carrier, all claim of right or interest in them, on his part, had ceased. The attaching creditor stands in his shoes, and can have no greater right or title than he had at the date of the attachment.

The letter of credit contained these words: "You are at liberty at all times to value on us as against actual shipments to the extent of three-fourths of their value, at five to ten days' sight." The statute concerning bills of exchange provides (R. C. 1855, p. 293, § 3), that "an unconditional promise in writing to accept a bill before it is drawn, shall be deemed an actual acceptance in favor of any person to whom such written promise shall have been shown, and who, upon the faith thereof, shall have received the bill for a valuable consideration." This language requires something more than a general letter of credit; it must be a promise to accept a bill, and the bill must be received on the faith of such written promise, to accept it. It is the established rule of law, that a written promise to accept a non-existing bill must point to the particular bill and describe it in terms not to be mistaken. (1 Pars. Bills, 293 & n. f.) The statute seems to have adopted this rule. This letter of credit amounted only to a general authority to draw bills for a given purpose, to indefinite amounts, and, on uncertain times, within a general limitation; it did not point to the particular bills, nor describe them in terms by which they could be identified. It did not amount to an "actual acceptance" of the bill in question.

It was so held in a like case upon a similar statute in New York, (Ulster County Bank v. McFarlan, 3 Denio, 553). Nevertheless, it was a promise to accept and pay bills drawn on him, which were to be negotiated by the drawer for his benefit, and it was evidently intended to be shown to the

persons to whom the bills so drawn were to be offered for negotiation, and to enable him to realize immediately upon them; and as the purchaser took the bill and advanced money on it, upon the faith of the letter, it is clear that he could maintain an action upon it against the promiser to recover the amount which he had advanced. (Sto. Bills, § 462; Russell v. Wiggin, 2 Sto. 213; Union Bank v. Costed, 3 Comst. 203; Larsdale v. Lafayette Bank, 18 Ohio, 126; Camyre v. Morrison, 2 Metc. 381; 2 Pars. Bills, 109.) It was therefore equally effectual upon this transaction as if it had amounted to an actual acceptance of the draft; for it created a liability against this consignee as for so much money allowed upon this very consignment. This alone would be sufficient to bring this case within that large class of cases, in which acceptances are considered as actual advances made upon the faith of particular consignments.

The amount paid upon the faith of this letter came clearly within the authority given by the letter of credit, and as the bill was never accepted, it becomes wholly immaterial whether it were drawn for an amount which exceeded the limit of the letter or not.

The evidence tended to show that Titus had practised some secret fraud in respect of the quantity of the coffee, and the valuation which he put upon it for the purpose of fixing the amount of his draft; but that did not change the character or effect of his consignment, nor does it affect the rights of the parties here. It was a general authority, and was to be taken most strongly against the giver of the power. It left the matter of the valuation to the agent; the banker could hardly be required to look beyond the letter of credit, the invoice and the bill of lading, and to reckon the expenses, fix the value, and weigh the coffee; and if a secret fraud were practised in these matters by the agent entrusted with such a power, it would seem that the principle ought to be applied, if it were at all necessary, that when one of two innocent persons must suffer, it should be the one

who gave the power and assumed the responsibility of the trust and confidence reposed in his own agent.

In this view of the case, it is evident that the clause in the instruction given for the plaintiff which left it to the court, sitting as a jury, to say whether " the said bill of exchange was drawn in conformity to the authority contained in said letter," was wholly immaterial. It really made no difference whether the bill were drawn in conformity with that authority or not. Considered by itself, it was clearly erroneous, as referring a matter of law to the jury; but it is equally clear that the defendant suffered no prejudice by that error; and the verdict and judgment being for the right party, the case will not be reversed on that ground alone. (R. C. 1855, p. 1300, § 34; Gobin v. Hutchins, 15 Mo. 400; Johnson v. Armdall, 34 Mo. 338.)

In accordance with the views above stated, all the instructions which were asked for by the defendant were correctly refused.

The judgment will be affirmed. Judge Wagner concurs; Judge Lovelace not sitting.