*J. F. Welborn* and *France & Rogers*, for plaintiff in error.

*Browne & Putnam*, for defendant in error.

---

# BREED *v.* FIRST NAT. BANK OF CENTRAL CITY.

(*Supreme Court of Colorado, April Term, 1882—Appeal from District Court of Gilpin County.*)

1. AGENT—RATIFICATION OF ACTS OF BY PRINCIPAL. If one acting as agent without original authority to borow money on behalf of his principal, does in fact so borrow money, and use it in a manner advantageous to the party to be charged, the ratification of such unauthorized act may be inferred from the silence of the principal after knowledge of the facts. It is his duty, if he does not acquiesce in the unauthorized act, to repudiate it. If he fail to do this within a reasonable time after notice, the jury may draw an inference of ratification.

2. NOTICE BY MAIL OR TELEGRAM. A letter sent by post is presumed, from the known course of that department of the public service, to have reached its destination at the regular time, and to have been received by

the person to whom it was addressed, if living at that place, and regularly receiving letters there; and the same presumption has been applied to telegrams.    It is for the jury, in view of the evidence, to determine the weight of the presumption as applicable to the facts of the case.

ELBERT, C. J.    At the December term, 1878, this case was before us upon the record of a previous trial, and was reversed upon two grounds, first, because the Court below refused to allow the appellant to introduce in evidence two written contracts, and, second, because the Court instructed the jury that Dawley, as the agent of Breed, had implied authority to borrow money. 4 Colo., 503.

Another trial was had, and the case is again before us for review upon numerous assignments of error.

The case presents, first, a question of agency, and, second, a question of the ratification of the unauthorized acts of the agent·

Notwithstanding the conflict of testimony, there was sufficient evidence to warrant the jury in finding that Dawley, at the time of the overdraft, sustained to the appellant Breed the relation of mining superintendent, and not that of a contractor.

Accepting this as his true character, he still had no authority by virtue of his office to bind his principal by note or overdraft. That was held in our former opinion in this case.

There is but little or no evidence that Dawley had express authority from Breed to overdraw, and but little going to show that Breed, by his course of dealing with Dawley, held him out to the world as an agent *authorized to borrow* money to carry on Breed's mining operations.    If, therefore, the plaintiff below had a right to recover, it was upon the sole ground of a subsequent ratification by Breed of the unauthorized act of Dawley, and this brings us to the only close question presented by the record.

The ratification chiefly relied upon by the appellee, and contested by the appellant, is one arising by implication.

In our former opinion it was said:    "If Dawley was without original authority to borrow money on behalf of his principal, but did in fact so borrow, and used it in a manner advantageous to the party to be charged, the ratification of his unauthorized act may be inferred from the silence of the principal after knowledge of the facts.    It is his duty, if he does not acquiesce in the unauthorized act, to repudiate it.    If he fail to do so within a

58

reasonable time after notice, the jury may draw an inference of ratification."

The claim is, that Breed had no notice of the overdraft, and consequently that no inference can be drawn from his silence.

The first overdraft by Dawley was in December, 1874, and amounted to $2,500. This was followed by others until April 27, 1875, when Breed, by telegram, ordered the work on the tunnel stopped. The entire overdraft at this time amounted to $3,373.

Mr. Dawley testifies, *inter alia*, as follows: "In December, 1874, I had no money to meet my November pay roll. I wrote Mr. Breed, and sent amount of indebtedness of tunnel, and received no answer.

"I overdrew my account at the bank several hundred dollars to pay the men, and wrote Mr. Breed respecting it, also telegraphed him, but received no reply.     *     *     *     *
I kept the tunnel going until April 27, 1875, when Breed telegraphed me to stop work.     *     *     *     * I sent Mr. Breed the pay rolls, or a monthly statement of the expenses."

Mr. Dawley executed notes for the overdraft, and says: "I notified Mr. Breed I had executed those notes in name of Caribou Tunnel, in December, by letter, just as soon as I did it.     *     *     * Mr. Breed did not answer the letter."

Thatcher testifies: "After the debt was contracted, I wrote Mr. Breed about it, but got no answer, the first letter was written at my house, and I have no copy of it. To the best of my knowledge it was deposited in the mail. We had great trouble in finding Mr. Breed. He was supposed to be in Cincinnati, or a letter would be forwarded to him from there, and we only wrote to him there. I used a return envelope, and the letter never came back. I wrote a telegram for Mr. Dawley, and I think I signed it with him. We tried to find Mr. Breed; he was in the interior of California, and could not be reached; the telegram was sent to San Francisco, but he was then in the Pleasant Valley mining region. It was sent within two or three days after Dawley got the money, and stated exactly what he had done; that he got this money from me to pay this pay roll, stating the amount. We received no reply. After several days the message was repeated. The second letter was written October 12, 1875, as follows:

'CENTRAL CITY, October 12, 1875.

'*Mr. A. D. Breed, Cincinnati, Ohio:*

'DEAR SIR—We had expected to see you here long before this, and now learn that you are East. I wrote you to request you to settle up our debt against the Caribou Tunnel Company, created by Mr. Dawley. It is a fair, honorable and just debt, and I trust you will not compel us to wait longer on this matter. The debt was created in the name of the C. T. Company, by Mr. Dawley, superintendent, and whatever the differences between yourself and Mr. D., it should not work an injury to us in delaying the matter. Please reply at once to this.     Yours very truly,

J. A. THATCHER, *President.*' "

There is no question about Breed's silence. Was the jury warranted in believing that Breed received any or all of the several letters and telegrams sent by Dawley and Thatcher?

Mr. Greenleaf says, that if a letter is sent by post, it is presumed from the known course in that department of the public service, that it reached its destination at the regular time, and was received by the person to whom it was addressed, if living at the place and usually receiving letters there. This presumption has also been held to apply to telegrams. I Greenleaf Ev., Sec. 40.

All of these letters were mailed to Mr. Breed at Cincinnati, Ohio, and there can be no doubt on the evidence but what that city was his usual post office address. He directed Dawley to send his pay rolls to that address, and an extensive correspondence with Dawley, extending through several years, was put in evidence, and is chiefly dated at that city. In the article of agreement, put in evidence by Breed, he is described as of the city of Cincinnati. Upon this point the evidence is satisfactory.

It seems that about the time of the first overdraft, in December, Breed was believed by Thatcher to be in California, and he tried to reach him there by telegraph, as well as by letter directed to Cincinnati. It does not appear that he was absent any considerable length of time. He telegraphed Dawley to stop work on the tunnel about the 27th of April, 1875, and wrote him from Cincinnati under date of May 11, 1875, acknowledging the receipt of a letter from Dawley, dated May 3d. Again, the correspondence of Breed shows him to have been actively engaged in business, and it is hardly to be presumed that he would leave

home for any considerable time without arrangements for forwarding or preserving his business letters.

It will also be observed that several of Breed's letters are in answer to Dawley's letters, received while absent from Cincinnati, and show that they were either forwarded to him, or were preserved for him until his return. When it is remembered in connection with these facts that Thatcher's letter was a return letter, and never came back to him, and that letters from Dawley, both prior to and after the overdraft, appear to have reached Breed with due regularity, and without any instance of failure, whether in Cincinnati, or absent therefrom, the fact of his absence for a time in California does not, in our view, destroy, or to any great extent weaken the presumption that the letters containing notice of the overdraft were received by him. The Court below, however, carefully instructed the jury touching this particular point in the case, as follows:

"The Court instructs the jury, that if a letter is sent by post, it is presumed, from the known course in that department of the public service, that it reached its destination at the regular time, and was received by the person to whom it was addressed, if living at that place, and regularly receiving letters there; and the same presumption has been applied to telegrams. This is a correct proposition of law, but to be applicable in this case, the jury must consider the evidence upon the question of Breed's place of living, and his whereabouts at the time letters and telegrams are alleged to have been sent him, in determining the weight of the presumption as applicable to the facts of the case, including Breed's testimony upon the question whether they were received by him."

The instruction could not fairly have been more favorable to the appellant.

Breed does not deny positively the receipt of Thatcher's letter. He says he does not "recollect ever having received it." It is also a noticeable feature of his testimony that, while he denies Dawley's authority as agent, and denies any notice of Dawley's claim to bind him by certain names by overdraft or note, he nowhere denies but what he did receive one or all of Dawley's letters and telegrams respecting the overdraft and notes. Again, in the conversation with Young in New York in the fall of 1875, to which Mr. Young testifies, while Breed does not ratify, he

certainly does not repudiate the claim.    He says: "I may pay that debt, Mr. Young.    I will not say I will not pay it, but I must examine further into the matter before I do so."    And in this conversation his denial is not that he has received any letter from Thatcher respecting the claim, but that he has received a letter within the last "two or three weeks."

It would seem highly improbable that the letters and telegrams were not received by Breed.    If not immediately, by reason of his absence in California, certainly by May, 1875, when he writes to Dawley from Cincinnati, under date of the 11th.

As bearing on the question of ratification by appellant, the Court admitted testimony showing that the money so drawn was expended upon the appellant's tunnel, upon which the appellant was prosecuting work under the superintendence of Dawley.    This was not error.

In the case of the *Union Mining Co.* v. *Rocky Mountain National Bank*, 2 Colo., 260, it is said:    "So also it seems that the appropriations of the money, and the fact that the use of it was advantageous to the party to be charged, are circumstances of some weight respecting the question of ratification."      *.      * *      *.    "It is fair to presume that a party will more readily repay money which has come to his use, although without his knowledge, than he would if it had been wholly appropriated by the person assuming to act in his behalf.    And where the money has been of advantage to the party to be charged, his willingness to repay it may depend largely upon that circumstance.    It is true that no legal obligation arises out of these circumstances, for no one can make himself the creditor of another, by doing an act beneficial to him, without his consent.    But, much less evidence of the assent of the principal to the act of the agent, may be required in a case where the money has come to his use, and has been expended in a manner advantageous to him, than would otherwise be necessary."    *Harris* v. *School District*, 28 N. H., 58; *Wilson* v. *School Dist.*, 32 N. H., 118; *Phila. etc. R. R. Co.* v. *Cowell*, 28 Pa., 329.

We have thus reviewed all the evidence touching the question of ratification, and are of the opinion that there was sufficient to justify the finding of the jury.    While it is not of the most satisfactory character, it is difficult to examine and weigh it without a strong conviction that Breed had notice of the overdraft and

notes, and failed to repudiate them as unauthorized acts, and as was his duty to do, in order to avoid his liability therefor.

Taking this view of the evidence, we see no reason for reversing the judgment of the Court below. This is the third trial of the cause, and the third verdict for the plaintiff. We have carefully considered the instructions and the objections to them, and think they plainly and fairly gave the law to the jury. The objections made to most, if not all, of the instructions are founded on the claim that there was no evidence of agency, or of ratification, or of notice; whereas, upon these several points, an examination of the evidence has led us to a different conclusion, as has been seen, and it is unnecessary to repeat in this connection what has already been said.

The judgment of the Court below is affirmed.

*Willard Teller*, attorney for appellant.