Walling, Judge.
This action was brought by the appellee against the appellant Nisbet, as sheriff, to recover possession of personal property, and damages, under chapter five, Mills’ Annotated Code. The amended complaint of the plaintiff (appellee here) set forth two separate causes of action, both based upon the same transactions, and differing only in the manner of detailing the facts supposed to entitle plaintiff to the judgment prayed. Omitting formal and immaterial matters, the following facts were alleged in the *498 amended complaint. On the twenty-second day of July, 1905, the plaintiff, a live stock commission company, doing business at the union stockyards in Denver, was lawfully possessed of three hundred and seventy horses, of the description and value stated in the complaint. The plaintiff claimed a special property in the horses, as the consignee thereof, in the nature of a factor’s lien, for the amount of certain drafts drawn on and paid by plaintiff, on account of the consignment of the horses to plaintiff, besides freight and shipping charges, incurred in the transportation of the horses from Mackey, Idaho, to Denver, paid by plaintiff, expenses paid by it for the feeding and care of the horses, and its commission. Prior to the date mentioned, one Abe Becker, apparently acting for one Tom Johnson, and in the name of said Tom Johnson, had arranged to purchase the horses in Idaho; and in pursuance of an arrangement between the plaintiff and Becker, plaintiff paid sight drafts drawn upon it by Becker, who drew said drafts in the name of Tom Johnson, per Abe Becker, to the aggregate amount of $9,431.50, for the purpose of paying the purchase price 'for the horses, except one thousand dollars theretofore paid thereon by Becker, and except about fifteen hundred dollars, due on drafts remaining unpaid. Under his agreement with the plaintiff, said Becker' shipped and consigned the horses from Mackey, Idaho, to the plaintiff, at Denver. The horses arrived at thp Union stockyards, in Denver, on the morning of July 22nd, 1905, ■ and were delivered to the plaintiff, as factor and consignee, prior to the seizure thereof by the defendant, and remained in plaintiff’s possession “until said defend *499 ant 'wrongfully seized and took possession thereof, as herein stated.” The money paid on the drafts, as aforesaid, was.paid by plaintiff to complete the payment of the purchase price for the horses; and the other sums paid as aforesaid were necessarily expended by the plaintiff for the protection of the property and plaintiff’s special interest therein, as consignee, and in the ■ performance of its duty as such consignee. The defendant Nisbet, who was the duly elected, qualified and acting sheriff of the City and County of Denver, seized the horses, in the possession of the plaintiff, and took them out of plaintiff’s possession, at said Denver Union stockyards, on July 22nd, 1905, “under a pretended writ of attachment in a pretended suit, wherein the Union Stockyards National Bank of South Omaha is plaintiff, and Abe Becker, alias Tom Johnson, is defendant;” and said sheriff refused to redeliver the horses to plaintiff, upon its demand therefor, and still detained them in his possession at the time of the commencement of the action. An answer was filed to the amended complaint, wherein the defendant admitted the allegations with respect to the plaintiff’s corporate organization and business, and the official capacity of the defendant, also the seizure of the horses under writ of attachment, and denied all other material allegations in the complaint. In what was designated as the “third and further answer to the first and second causes of action,” the answer alleged the due issuing of a writ of attachment to the defendant, as sheriff, in the action of the Union Stockyards National Bank of South Omaha against Abe Becker, alias Tom Johnson, upon a promissory note, then pending in the district *500 court of the City and County of Denver, and that, under said writ of attachment, the defendant levied upon and took into his possession the horses in controversy, and retained possession of them from July ,22nd until July 25th, 1905, when they were taken from him under the plaintiff’s writ of replevin. This defense further alleged- that the horses were the sole and exclusive property of Becker, and that the plaintiff had not at any time any ownership or interest therein, or claim thereto or lien thereon; and alleged a fraudulent combination between Becker and the plaintiff to ship the horses to Denver, in such manner as to prevent Becker’s creditors, and particularly the attaching bank, from subjecting the horses to the payment of their claim against Becker, in furtherance of which fraudulent purpose they made use of the name of Tom Johnson, as pretended consignor; that said Tom Johnson had no interest whatever in the horses, and that the use of his name in that transaction by 'the' plaintiff was “purely bogus, fictitious and fraudulént, and was made solely for the purpose of assisting the said Becker in defrauding his creditors.” The answer also states that the horses were shipped to Deüver by Becker, and were in the latter’s possession at the time of the levy under the writ of attachment; and that the plaintiffls pretense that it was in possession of the property at the time of the levy thereon was a part of the scheme to defraud Becker’s creditors, and to cover up and conceal the-property, and that any money claimed to have been paid out by the plaintiff on drafts, or for freight and feeding, or otherwise, was the money of Becker and not of the plaintiff. The answer prayed judgment for the recovery *501 of the possession of the horses, or for their value, and for damages and costs. The replication to the answer admitted the official character of the sheriff, that a writ of attachment “issued in a pretended suit wherein the Union Stockyards National Bank of South Omaha, Nebraska, was plaintiff, and one' Abe Becker, alias Tom Johnson, was defendant, came into the hands of the defendant, as such sheriff,” and that the defendant held possession of the property in dispute for the time alleged, and, except as to the allegations specifically admitted, denied each and every allegation of the answer. “For a second and further reply,’’ the replication stated facts showing that Becker was insolvent at the time of the attachment alleged in the answer, and within four months thereafter filed his petition in bankruptcy in the United States district court for the district of Colorado, and was thereon adjudged a bankrupt; and it was averred that, by reason of the adjudication of bankruptcy, the attachment became and was null and void. It appears from the record that the demurrer interposed by the defendant sheriff to the last mentioned “second and further reply” of the plaintiff was sustained, and that portion of the replication was not reinstated, by amendment or otherwise. Prior to the filing of the amended complaint, the appellant, Bobert M. Work, intervened in the action, by petition, which was later amended. The plaintiff (appellee) answered the amended petition in intervention, and the intervenor replied to that answer. The bill of exceptions shows that the cause came on for trial in the district court, before the court and a jury, the plaintiff and defendant appearing by their respective attorneys, and the *502 “intervenor, Robert M. Work, trustee in bankruptcy of the estate of Abe Becker, bankrupt, appearing in person.” It appears from the record that, during the progress of the trial, an order was entered'dismissing the petition of the intervenor at his costs. The intervention proceedings will be more fully considered in investigating the separate appeal of the appellant Work. It will prevent confusion in determining the questions presented upon the record, if the controversy as between the plaintiff and defendant shall be kept separate at all points from that between the plaintiff and the intervenor. After both plaintiff and defendant had rested tlieir cases respectively upon the evidence adduced at the trial, plaintiff’s counsel moved that the court instruct the jury to return a verdict in favor of the plaintiff, finding the plaintiff entitled to the possession of the horses in controversy, and defendant’s counsel likewise moved for a directed verdict in his behalf for the possession of the horses or their value as alleged in the complaint. The defendant’s motion for a peremptory instruction was based upon the propositions, first, that the arrangement with Becker was entered into by the plaintiff, “knowing or having ample means of knowing” that said Becker-was insolvent, and was attempting, by using a false name, to conceal the transaction from his creditors, and to hinder, delay and defraud them; and, second, that the evidence failed to show that plaintiff ever took from Becker the “actual, open; notorious and unequivocal possession required by the statute of frauds, prior to the levy of the attachment writ of the defendant.” The motion of the defendant for a peremptory instruction in his favor was overruled, *503 and the court instructed the jury to find for the plaintiff. Subsequently judgment was rendered upon the verdict in favor of the plaintiff and against the defendant for the possession of the property, and- costs, from which judgment appellant Nisbet prosecutes this appeal; while appellant Work has appealed separately from the order dismissing his petition of intervention.
It appeared from the evidence that the plaintiff was engaged in the business of buying and selling-live stock on commission, its place of business being at the yards of the Denver Union Stockyards Company, in the City and County of Denver. Shortly prior to the shipment of the horses in question from Mackey, Idaho, to Denver, one Abe Becker came to the manager of the plaintiff, at his place of business in Denver, and showed the latter a contract for the purchase of certain horses in Idaho, upon which Becker, as he stated, had paid one thousand dollars, and he proposed that the plaintiff should “handle” the horses and advance the money upon his drafts to pay the remainder of the purchase price. Plaintiff’s manager then agreed to undertake the business of handling the horses, and to pay drafts to be drawn by Becker to cover the remainder of the purchase price, provided that Becker would deposit one thousand dollars with the.plaintiff to guarantee it against loss in the transaction. It appeared that Becker had been, for some time, prior to this transaction, carrying on his business under the name of Tom Johnson, by Abe Becker, agent; and the thousand dollars required by plaintiff’s manager was deposited by Becker, and credited on plaintiff’s books to Tom Johnson. A few days after this ar *504 rangement was made, one Moore informed plaintiff’s manager that Becker had asked him, Moore, to go to Idaho and -ship the horses, and plaintiff’s manager then told Moore to go ahead and ship the 'horses, and the plaintiff would see that Moore got his money. On the seventeenth day of July following, the horses in controversy were shipped from Mackey, Idaho, consigned to the appellee, at Denver, and they arrived at the Denver stockyards early in the morning of July twenty-second following. On the day prior to the arrival of the horses in Denver, appellee paid sight drafts drawn upon it to the amount stated in the complaint, signed “Tom Johnson, per Abe Becker,” in pursuance of the arrangement made with Becker to pay his drafts for the balance of the purchase price of the horses, as above stated. The shipping contract, under which the horses were transported from Mackey, Idaho, to Denver, was signed “Tom Johnson, shipper, by Abe Becker, shipper’s agent,” and that contract, and accompanying certificate of inspection and waybills, designated the plaintiff as the consignee. Upon the unloading of the horses from the cars at the stockyards, in Denver, they were taken in charge by employes of the plaintiff, who attended to providing feed, and, under the direction of plaintiff’s manager, were engaged in assorting and arranging the animals in different classes or groups, and putting them in separate pens, for purposes of sale. The regular employes of the plaintiff were assisted in this work by Moore, who had come with the horses from Idaho, and one White, who had previously arranged with Becker, and afterwards with plaintiff’s manager, to offer the horses at a sale advertised by White to *505 take place at the stockyards two or three days later. It was in proof, and nncontradicted, that the stockyards company paid the shipping charges for the transportation of the horses, and that those charges, together with the cost of feeding, and the customary yard expenses, were charged by the stockyards company to the plaintiff in the usual course of business between them, and were subsequently paid by' the plaintiff. It appeared that these items of expense amounted to something over twenty-five hundred dollars.
The defendant introduced as a witness the deputy sheriff, who made the levy under the writ of attachment in the action of .The Union Stockyards National Bank against Becker. The deputy testified that he went to the stockyards, on the morning of July twenty-second, with the writ of attachment, and a garnishee summons directed to the Sigel-Campion Live Stock Commission Co., A. J. Campion, manager, garnishee. He served a copy of the attachment writ and also of the garnishee summons, on plaintiff’s manager, at the stockyards, but he did not remember when he served Becker. He stated that, when he got to the stockyards, the horses had been unloaded, and that some persons, whom he did not know, and whose names he did not ascertain, ‘1 seemed to be cutting out and sorting up the horses in different pens;” and he said that after serving the attachment writ on appellant’s manager, he told the manager that he, the deputy, “would have to take the horses into possession, — that they could go ahead and sort them, handle them, as long as they did not take them out of the corrals.” The deputy further said, “I think he (plaintiff’s manager) *506 showed me exactly where they were, although he claimed all the time they were not Abe Becker’s. But he showed me these horses that were claimed by attachment.” In connection with the examination of the deputy sheriff, defendant’s counsel offered in evidence the original writ of attachment, appearing to.have been issued in the case of The Union Stockyards National Bank against Abe Becker, alias Tom Johnson, together with the return of the sheriff thereon, showing the service of the writ and the levy upon the horses described in the complaint in the action, and also the original garnishee summons directed to the plaintiff. The objection of counsel for plaintiff to receiving these papers in evidence was sustained by the court, and an exception to that ruling was duly noted on behalf of the defendant. The writ of attachment was regular upon its face, and nothing in the return indicated any irregularity in the proceedings of the sheriff thereunder. In such circumstances, was the action of the court, in refusing to admit the writ and return in evidence, error requiring the reversal of the judgment? It is the general rule, based upon sound reason and sustained by the current of authority, that when property has been taken by an' officer, claiming to act under the authority of a writ of attachment, from the possession of a stranger to the action in which the writ was issued, claiming title, before the officer can be heard to attack the title of the person in possession, on the ground that it was fraudulent as to creditors of the defendant in the attachment action,-he must show not only a writ regular on its face, hut also that the preliminary steps were taken essential to authorize the *507 issuance of the writ, and that it was issued upon a bona fide existing indebtedness. The rule of evidence was stated in Oberfelder v. Kavanaugh, 21 Nebr. 483, as follows:
“Drake, in his valuable work on attachment, states the law as follows: ‘When the officer attaches property found in the possession of the defendant, he can always justify the levy by the production of the attachment writ, if the same is issued by a court or officer having lawful authority to issue it, and be in legal form. When the property is found in the possession of a stranger claiming title, the mere production of the writ will not justify its seizure thereunder; the officer must go further and prove not only that the attachment defendant was indebteded to the attachment plaintiff, but that the attachment was regularly issued.’ ” Drake on Attachment (6th ed.), section 185A; Thornburgh v. Hand, 7 Calif., 554; Noble v. Holmes, 5 Hill (N. Y.), 194; Van Etten v. Hurst, 6 Id., 311; Mathews v. Densmore, 43 Mich., 461; Williams v. Eikenberry, 22 Nebr., 211; Spaulding v. Overmire, 40 Nebr., 21; Cobbey on Replevin (2nd ed.), sections 1009, 1010; Bogert v. Phelps, 14 Wis., 88; James v. Van Duyn, 45 Id., 512.
Chief Justice Dixon said, in Bogert v. Phelps, supra:
“In case of an action by the party against whom process issued, the process itself, being valid on its face, constitutes a complete justification. In case of suit by another claiming title to the property seized, under such (writ), which title is contested on the ground of fraud, he must, in addition to showing that he acted under such process, show that *508 lie acted for a creditor. Where he acts under process of execution, this is done by producing the judgment on which it is issued. If it be mesne process, then the debt must be proved by other competent evidence. This proof, however, is required, not because it affects the process, or is in that respect necessary to protect the officer, but because it affects the title to the property in question. No one but a creditor can question the title of the fraudulent vendee, and hence he must show that the relation of debtor and creditor exists between the party against whom the attachment or execution ran and the person in whose behalf it was issued.”
In Wyatt v. Freeman, 4 Colo., 14, it was held that the defendant sheriff could not justify the seizure of the property replevied from him by the sheriff, under a writ of execution issued against another, by showing that plaintiff’s claim -oí ownership was fraudulent as to creditors of the defendant in the writ, without proving that the execution was issued upon a judgment, which was unsatisfied. However, in Hall v. Johnson, 21 Colo., 414, it was held that where the plaintiff in an action of replevin against a sheriff claimed a special ownership in the property, based upon a chattel mortgage, which was void on its face as against creditors of the mortgageor, he could not recover against the officer, who had seized the property under a writ of attachment against the mortgageor, the writ being regular on its face; and it is necessary to inquire whether the case at bar falls within the principle of that decision. It has already been shown that the plaintiff claimed a special lien upon the horses, as a factor, by reason of the advances made *509 by it on account of them, and that tbe evidence showed that they were seied by the defendant in plaintiff’s possession. The general characteristics of the lien of a factor, in the absence of statutory regulation, were thus defined by Judge Story:
“It is now incontrovertibly established, as a matter. of law derived from long usage, and admitted without proofs, that factors have a general lien upon every portion of the goods of their principal in their possession, and upon the price of such as are lawfully sold by them, and the securities given therefor, for the general balance of the accounts between them and their principles, as well as for the charges and disbursements arising upon those particular goods. The lien may also extend to all sums for which a factor has become liable, as a surety or otherwise, for his principal, wherever the suretyship has resulted from the nature of the agency, or it has been undertaken upon the footing of such a lien. * * * This general lien given to factors, has been established upon its manifest tendency to aid the interests of trade and commerce, and to promote confidence and a liberal spirit on the part of factors in respect to advances to their principals. It is deemed to exist in all cases, until the contrary presumption is clearly established. ’ ’ Story on Agency, sections 376, 378. See Jones on Liens, section 418; Clark and Skyles on Agency, section 868; Holbrook v. Wight, 24 Wend., 168; Plattner Imp. Co. v. International Harvester Co., 133 Fed., 376; Nagle v. McFeeters, 97 N. Y., 196.
The authorities clearly sustain the proposition that where the lien exists, it is superior to the claims of subsequent purchasers and creditors, and *510 is not subject to be defeated by attachment or execution against the principal. While the testimony of the plaintiff’s manager was not in all respects as clear and satisfactory as. might be desired, it did establish, without any contradiction, the existence of an understanding that Becker was to complete the purchase of the horses, under the contract exhibited by him to the manager, and draw at sight on the plaintiff for the money necessary to pay for them; and that the horses were tó be shipped to plaintiff at Denver, in order that the plaintiff might sell them and be reimbursed out of the proceeds for his advances made in connection with the transaction, Becker meanwhile depositing one thousand dollars with the plaintiff, which, together with the like sum already paid on the purchase price of the horses, was considered by the plaintiff’s manager as a sufficient margin to protect his company against any loss in the undertaking. It further appeared that the drafts drawn upon the plaintiff from Mackey, Idaho, were paid in pursuance of the arrangement mentioned on account of the horses. The testimony of plaintiff’s manager, in effect as stated, was uncontradicted.
It has been argued with much vigor, on the part of the appellant Nisbet, that there was no proof that the proceeds of the drafts paid by the plaintiff were actually used to pay the purchase price of the horses. While the proof is not definite upon that point, we think that there was some evidence tending to show that the proceeds of the drafts were so applied, and nothing was shown to the contrary. It is certainly true that the plaintiff’s manager stated, again and again, on the witness stand, that *511 the drafts were paid for the purpose of paying for the horses, and the only inference deducible from the undisputed facts in evidence is that the horses were shipped to the plaintiff by Becker for the purpose of carrying out the previous arrangement between them. In fine, the undisputed evidence at the trial was sufficient to prove that the horses were shipped to the plaintiff, as a factor, and it made the advances on account of them pursuant to the arrangement to that effect, as above stated. This was enough to entitle the plaintiff to a lien upon the horses, to the extent of the advances made upon the drafts, and for the expenses legitimately incurred and paid by it, in connection with the consignment and the performance of its duties as a factor, as well as for the preservation of the property and its lien thereon, after the horses were consigned to plaintiff, if the plaintiff had acquired the possession of the horses prior to the time when they were taken into the possession of the defendant. “A factor’s lien, being a general lien, and therefore dependent on possession, it does not come into existence or take effect until the property on which it is claimed has lawfully and in good faith come into the actual or constructive possession of the factor.” Clark and Skyles on Agency, section 869.
Much has been said in .argument on both sides as to whether or not the delivery of the horses to the carrier gave to the plaintiff such constructive possession as was necessary to give rise to the lien claimed for its advances. It would serve no good purpose to undertake to review the multitude of cases, in which there have arisen questions involving the rights of the consignor, consignee, and third *512 parties, with respect to property in the custody of a carrier for transportation. Such questions have usually been determined upon the particular facts involved in each case, and no certain general rule has been derived from the authorities, to control this case. In this instance, it is reasonably certain that the drafts were paid by the plaintiff upon the faith of the delivery of the horses; and that they were consigned to the plaintiff in order that the latter might sell them and pay the amount of its advances out of the proceeds, and account to the consignor for the difference between the gross proceeds — plus the thousand dollars deposited, and the moneys advanced and paid out by the plaintiff in the transaction. If the drafts drawn on the plaintiff had been paid at or shortly before the time of shipping the horses, it might reasonably be concluded that the delivery of the horses to the carrier was ;prima facie a delivery of the possession to plaintiff. In such case, the only apparent objection to the immediate vesting of the possession, upon delivery to the carrier, would have been the fact that the bill of lading or shipping contract was never transmitted or delivered to the plaintiff. There are many decisions to the effect that, where the consignee is the agent of the owner or shipper, the former cannot claim a lien for advances made to his principal upon the property in transit, until he has received the bill of lading, or its equivalent, as the representative of the property, or the property itself has come into his actual possession. The reason underlying the decisions last referred to seems to be that, so long as the general owner retains possession of the -bill of lading issued by the carrier, it is in his power *513 to change the destination, upon notice to the carrier, and, by assigning the bill of lading, transfer the right of possession of the property in the hands of the carrier to a bona fide pledgee or purchaser for value, thereby eliminating the original consignee. But the reason has no application to the facts of' this case, wherein there was no assignment of the bill of lading, for value or otherwise. In a case like this, it should be held that the lien of the plaintiff attached upon the payment of the drafts, the horses having been previously consigned to it, in' pursuance of the arrangement made with Becker, although prior to such payment the plaintiff had no interest of any kind in the horses, either under the consignment or by virtue of the prior agreement. Strauss v. Wessel, 30 Ohio St., 211; Bailey v. Hudson River R. R. Co., 49 N. Y., 70; Ruhl v. Corner, 63 Md., 179; Holbrook v. Wight, supra; Valle v. Cerres, Admr., 36 Mo., 575; Wade v. Hamilton, 30 Ga., 450; Elliott v. Cox, 48 Id., 39; Strahorn v. Union Stock Yards & Transit Co., 43 Ill., 424.
Upon the facts here in evidence, however,.the rights of the plaintiff did not depend upon the delivery of the horses to the railroad company to be transported to the plaintiff at Denver, because the duties of the carrier, under its contract with the shipper, were completed when the horses were unloaded at the Denver Union stockyards, and there accepted by the manager of the plaintiff, who assumed such control of them as the nature and situation of the property permitted. "Whether the stockyards company, in unloading the horses from the cars at its yards, acted as the agent of the carrier, or of the plaintiff, as consignee, is wholly im-
*514 material, because the evidence sufficiently established the fact that the horses were actually in the possession of the plaintiff, in accordance with the custom of business between the plaintiff and the stockyards company, when the sheriff arrived at the yards with the writ of attachment, and that the sheriff himself was aware of that fact. There was no evidence tending to show that, at the time of the alleged levy of.the attachment, the horses were in the possession of Becker, the defendant named in the writ. The plaintiff’s possession was not colorable merely, but under claim' of right in itself to hold and dispose of the property and repay itself from the proceeds. In these circumstances, it devolved upon the defendant in the district court to justify the seizure of the horses, not only by proving that the possession of the plaintiff was fraudulent in fact as to creditors of Becker, but also that the attachment writ was issued pursuant to lawful proceedings instituted by a creditor. The recitals in the writ itself „indicating that the necessary steps had been taken did not supply the evidence of the facts as against a stranger to the attachment action. Thornburgh v. Hand, supra. The court, therefore, did not err in excluding the writ of attachment and accompanying return.
We agree with counsel for appellant Nisbet that the proceedings in the matter of the bankruptcy of Becker were wholly .immaterial to any issue as between the plaintiff and the defendant. Not only were such bankruptcy proceedings eliminated from the issues, as between the plaintiff and defendant,' when the demurrer was sustained to the portion of the replication setting up those proceedings against *515 the defense of justification under the attachment against Becker, but it is impossible to conceive how either plaintiff or defendant could claim any right against the other, based upon any provisions of the federal bankruptcy law. If, as stated by appellant’s counsel, the learned judge, who presided at the trial, excluded the attachment writ for the reason that the attachment had been released or discharged by the operation of clause / of section sixty-seven of the bankruptcy act, it follows that a correct conclusion was based upon an insufficient reason. See Bailey v. O’Fallon, 30 Colo., 419.
Having determined, for the reasons herein stated, that the writ of attachment offered in evidence on the part of the defendant was properly excluded, the allegations of the answer charging fraudulent combination to hinder, delay and defraud the creditors of Becker became immaterial, even if there had been evidence in the record in support of those allegations to justify a verdict for 'the defendant. As to thht, the evidence is far from convincing that any of appellee’s officers was actually guilty of the fraudulent motives charged in argument on behalf of appellants. It is plain enough that Becker’s assumed agency for Tom Johnson, in this and other transactions, was a pure fiction on his part, and unquestionably a device invented by him for the purpose of covering up and concealing his operations from his creditors. Nevertheless, there was no direct or positive evidence to charge the manager of appellee, who transacted the business with Becker, as the ostensible agent for Johnson, with knowledge of or participation in Becker’s fraudulent purpose. The manager denied that he *516 had knowledge or information that the agency for Johnson was simulated or fictitious, and the matters relied on hy appellants as showing complicity of the appellee in Becker’s fraudulent scheme, so far, as supported by any evidence, at most amounted to nothing more than suspicious circumstances. The claim of a factor to be reimbursed, out of property consigned to him in the usual course of his business, for advances actually made on the credit of the consignment, is entitled to the same general presumptions of honesty and good faith applicable to other commercial transactions; and there was not sufficient evidence in this case to overcome that presumption. But it has been shown that the defendant was not in a position to attack the plaintiff’s prior possession, on the ground of alleged fraud upon the creditors of Becker.
It has been stated that, after the evidence was all in upon the trial, and both plaintiff and defendant had rested, each requested the court to instruct the jury to return a verdict in his favor. The effect of this proceeding, in the circumstances existing at the time the court was asked by both sides to direct the verdict, was to withdraw the question of plaintiff’s possession from the consideration of the jury and submit it to the decision of the court, no request having been made on either side to submit any question of fact to the jury. There was abundant evidence to justify a finding in favor of the plaintiff upon that issue; and it must be conclusively presumed, on this appeal, that the court so found. Dillon v. Cockroft, 90 N. Y., 649; Kirtz v. Peck, 113 Id., 222; Clason v. Baldwin, 152 Id., 204; Merwin v. Magone, 70 Fed., 776; Leggat v. Leg *517 gat, 80 N. Y. Sup., 327, 176 N. Y., 590; Coughlin v. Coughlin, 26 Ohio C. C. Rep., 42; Sundling v. Willey, 19 S. Dale, 293. We find no error in the rulings of the court upon the motions to direct the verdict.
The conclusions reached sufficiently dispose of all the substantial exceptions urged on behalf of the appellant Nisbet for the reversal of the judgment against him.
Considering now the separate appeal prosecuted by the intervenor, it is evident from the record before us and the arguments of counsel for the appellant and appellee, that the result of that appeal hangs upon the solution of the question whether or •not the district court was in error in refusing to permit the intervenor to introduce any proof, and in dismissing his petition of intervention, at the trial; and the inquiry has been further narrowed by the arguments of counsel to the investigation of the right of the intervenor, upon the facts alleged by him, to claim anything in the replevin action against the plaintiff therein. The contention of the appellant intervenor is that, in the capacity of trustee of the bankrupt estate of Abe Becker, he had, at the time of filing his petition of intervention, a right of action against the plaintiff, either for the value of the horses replevied in the action or the proceeds of the sale of them by the plaintiff. Much has been said in the argument of the intervenor touching the right of a trustee appointed in proceedings under the bankrupt act to litigate in the courts of the state with respect to the assets of the bankrupt estate. There can be no doubt at this time, if there ever was any, that the- state courts are open to a trustee *518 in bankruptcy, seeking to enforce or protect the rights or interests pertaining to his trust, to the same extent, in general, as in the case of any other litigant properly invoking their jurisdiction. The right of such trustee to prosecute a right of action, based upon the provisions of the bankrupt act, in our courts, was distinctly recognized in Andrews v. Kellogg, 41 Colo., 35. It is not intended to enter into a general discussion • of the rights and duties of 'the trustee, under the bankrupt act, with respect to suits pending at ’ the time of the adjudication, wherein the bankrupt was a party, or between third parties involving a controversy respecting property in which the trustee claims some interest under the act. It is certain that, if he seeks to intervene in a pending action to which the bankrupt was not a party, he must show, by his allegations, a right so to do in accordance with the practice of the court, wherein the action is pending. In this case, for instance, it was incumbent on the trustee to allege, as well as prove, facts showing an interest in the subject of the controversy, which entitled him to be made a party therein, in order that his rights might be protected by the final judgment in the action. Section twenty-two of the Code of Civil Procedure of 1887 provides: .
“Any person shall be entitled to intervene in an action who has an interest in the matter in litigation, in the success of either of the parties to the action, or an interest against both. An intervention takes place when a third person is permitted to become a party to an action between other persons, either in joining the plaintiff in claiming what is sought by the complaint, or by uniting with the *519 defendant in resisting the claims of the plaintiff, or by demanding anything adversely 'to both the plaintiff and defendant.”
“The intervention shall be by petition, filed in the cause, * * * and it must set forth the grounds upon which the intervention rests. A copy of the petition shall be served upon the parties to the action against whom anything is demanded, who shall answer as if it were an original complaint in the action.” Code, section twenty-three.
It is well settled by the authorities that the intervening petition must show some interest of the intervenor, in the matter in litigation, in common either with the plaintiff or the defendant, or adverse to both of them, “of such a direct and immediate character that the intervenor wilL either gain or lose by the direct legal operation and effect of the judgment.” Pomeroy’s Code Remedies, section 429; Limberg v. Higginbotham, 11 Colo., 316; Curtis v. Lathrop, 12 Id., 169; Wood v. Waterworks Co., 20 Id., 253; Westcott v. Patton, 10 Colo. App., 544. If, then, measured by the standards mentioned, the amended petition of the intervenor failed to allege facts entitling him to relief in the action, it' was not error to sustain the plaintiff’s objection to the introduction of proof on the part of the intervenor at the trial, and thereupon to dismiss his petition.
The intervenor was designated in his amended petition as “trustee in bankruptcy of the estate of Abe Becker.” But, although it was alleged that Becker “on the twelfth day of August, 1905, filed in the district court of the United States for the district of Colorado his voluntary petition in bank *520 ruptcy,” it was not averred that Becker was adjudged a bankrupt, ox that the intervenor had been in any manner appointed as trustee, in the bankruptcy proceedings. So far as this omission affected the capacity to sue in the character of trustee, the defect was waived by the plaintiff, by answering the amended petition. But the averment of the adjudication of bankruptcy was evidently essential to the assertion of a right, based upon any provisions of the bankrupt act, which Becker himself could not have claimed. Without such adjudica-' tion, the allegation of the filing of the petition in bankruptcy was unimportant. The .entire argument of the intervenor on this appeal rests upon the fact of the adjudication of bankruptcy; and the failure to allege it was a material defect in his petition, which was in no wise aided by the answer or replication in the intervention proceeding. It is not perceived how the defect can be cured here. Emery v. Yount, 7 Colo., 107; Sykes v. Kruse, 19 Id., 560; McKnight v. McKnight, Id., 60, 65.
But if the failure to allege that material fact— which, indeed, does appear elsewhere in the record —might be overlooked in this court, nevertheless the amended petition failed to show a sufficient cause for the intervention on the part of the trustee. The statements therein that ‘ ‘ as such trustee and as the-guardian of the rights of the creditors of said Becker, he (intervenor) has an interest in the subject-matter of this suit” cannot be accepted as establishing a right of intervention, in the absence of allegations of facts supporting the conclusion. The plaintiff based his right to the possession of the replevied property upon a specific claim of lien thereon exist *521 ing prior to the bankruptcy proceedings, while the defendant undertook to justify under an attachment levied before the institution of those proceedings. A trustee appointed in pursuance of a subsequent adjudication of bankruptcy, as the representative of the bankrupt’s estate, had no common interest with either plaintiff or defendant in the pending replevin action. Therefore the intervention could not be sustained, unless it appeared from the facts alleged by .the intervenor that he was attempting to enforce some right or interest in the controversy against both of the original parties. Construing the alle-< gations of the amended petition most favorably for the intervenor, it was therein alleged that Becker purchased the horses, about June 19th, 1905, and paid thereon one thousand dollars, and thereafter, about June 27th, 1905, “Becker left in the hands of the plaintiff herein money to the amount of several thousand dollars, the exact amount of which is to this intervenor unknown,” and that the further purchase price of said horses was paid by drafts drawn on the plaintiff by Becker, who used the name of Tom Johnson for that purpose; that the amount of said drafts was “wholly or in large part” covered by the money left in the hands of plaintiff by Becker, and that the money advanced by the plaintiff was furnished with knowledge that Becker was wholly irresponsible and insolvent. It was further stated in the petition that Becker “was greatly indebted to various individuals and corporations, as-plaintiff well knew, ’ ’ and that the Union Stockyards National Bank of South Omaha, Nebraska, was then the owner of a note which thereafter became a judgment in its favor against Becker in the amount of *522 $26,050; and that Becker was known to the plaintiff to be so conducting his transactions /as to avoid payment of the claims of his creditors, including the Stockyards National Bank, and with such knowledge, “and in furtherance of said Becker’s fraudulent schemes, said plaintiff fraudulently entered into the agreement alleged in the answer herein,” which answer, “and all allegations therein made,” the intervenor adopted, and asked that the same be “considered and treated by the court as a part of this, his petition of intervention.” From the foregoing statements, it would seem that the intervenor conceived that he had some legal interest in the defense of the sheriff, but the nature of that interest was not made apparent. The reference made to the answer is only confusing, because, even if the allegations of the petition could have been helped •by the wholesale adoption of the contents of another pleading (see San Juan, etc., Co. v. Finch, 6 Colo., 241), the record discloses no answer in the case, at the time the amended petition was filed. The remainder of the petition of intervention further represented, “that any lien claimed by plaintiff as a factor or otherwise, on the said horses, as set forth'in the complaint, is utterly null and void, as it was obtained from said Becker, if at all, while said Becker was insolvent, and within four months prior to the filing of his petition in bankruptcy, and the property was thereby wholly discharged and released from said lien, and should be held for the benefit of- the said estate. That plaintiff well knew that said Becker was insolvent and in contemplation of bankruptcy, and that such lien, if any there was, was sought and permitted in fraud of the pro *523 •visions of the United States bankruptcy act of 1898.”
Reliance is placed, in the argument for the intervenor, upon clause / of section sixty-seven, of the. bankruptcy act, which provides that “all levies, judgments, attachments or other liens, obtained through legal proceedings against a person who is insolvent, at any time within four months prior to the filing of the petition in bankruptcy against him, shall be deemed null and void in case he is adjudged a bankrupt, and the property affected by the levy, judgment, attachment, or other lien, shall be deemed wholly discharged and released from the same, and shall pass to the trustee as a part of the estate of the bankrupt,-unless the court shall, on due notice, order that the right under such levy, judgment, attachment, or other lien, shall be preserved for the benefit of the estate; and thereupon the same may pass to and shall be preserved by the trustee for the benefit of the estate as aforesaid.” The application- of the- quoted provision of the bankrupt law to the allegations of the amended petition is not obvious. As construed in First National Bank v. Staake, 202 U. S., 141, the section (67/) “makes two distinct provisions for the disposition of the property of an insolvent attached within four months prior to the filing of a petition in bankruptcy against him. First, such attachments shall be declared null and void, and the property affected shall be deemed released, and shall pass to the trustee of the estate of the bankrupt; or second, the court may order that the right acquired by the attachment shall be preserved for the benefit of the estate.” Of course, the court meant is the court of bankruptcy.
*524 It is uncertain, from the argument of the intervenor, whether he wishes to rely upon the first or second provision of the section. It is manifest that he cannot insist on both provisions. The dissolution of the attachment, under the first provision of the section, would have been of no advantage to the intervenor in the replevin action, in connection with the averments of his petition. He could have gained nothing by the nullification of the writ as against either plaintiff or defendant. Such nullification could only have availed to enable the trustee to recover the attached property, or its proceeds, if the same had remained in the hands of the sheriff, in the attachment action.
“The first provision (annulling the attachment) contemplates the attachment of property to which the bankrupt has the complete legal and equitable title, which, as soon as the attachment is dissolved, passes at once to the bankrupt’s trustee as part of his estafe.” First National Bank v. Staake, supra.
On the other hand, if the intervention of the trustee was for the purpose of claiming the benefit of the levy under the attachment writ alleged in the defendant’s answer, as the basis for recovery against the plaintiff, it must have appeared from the pleadings that the trustee was authorized by proper order of the court of bankruptcy to preserve the attachment for the benefit of the bankrupt estate. First National Bank v. Staake, supra; Watschke v. Thompson, 85 Minn., 105.
Beyond that, the intervenor, if he sought to recover in the right of the attaching creditor, must have alleged the facts essential to constitute a valid attachment of the property in dispute, as between *525 such attaching creditor and the plaintiff in the action. In other words, he must have shown a right under the attachment to the property replevied from the defendant. The intervenor in this case not only failed to allege an order of the court of bankruptcy, that any right acquired hy the attachment in the action of the Union Stockyards National Bank against Becker should he preserved for the benefit of the bankrupt estate, hut he made no reference whatever to the attachment, in his petition.
What has been said is not to be understood to mean that any right of action, which the trustee in bankruptcy might have asserted, necessarily or' at all depended upon the validity of the levy of the .writ of attachment in the action of the Stockyards National bank. It is fyuite conceivable that such trustee may have had, in virtue of some provision of the bankrupt act other than those found in section sixty-seven /, some right of action against the appellee, arising out of its transactions with Becker in connection with the property in dispute in the replevin action; hut it is not apparent that any such right of the trustee could have been in any manner affected hy the judgment as between the plaintiff and defendant in the replevin action, so as to make it the subject of intervention therein. For example, the claim made in argument, that the pleadings disclosed the fact that the lien claimed hy the plaintiff in his complaint amounted to a preference voidable under sections sixty a and 6 of the bankrupt act, in no wise involved the validity of the levy under the writ of attachment set up in the answer of the defendant, or any right resulting from either the annulment or the preservation of the attach *526 rnent. However, without any reference to the form of the -proceeding, the pleadings as between the intervenor and plaintiff disclosed no cause of action against the plaintiff, on the ground that it had received a preference within the condemnation of the bankruptcy act. The statements in the petition to the effect that the lien claimed by the plaintiff in his complaint was “null and void,” and “was sought and permitted in fraud of the provisions of the United States bankruptcy act,” were only conclusions of law, the validity of which must depend upon the facts stated. The allegation that Becker was insolvent, to the knowledge of the plaintiff, at the time the' money was advanced on the drafts, was not enough to show that the lien claimed by the latter constituted a preference voidable under the act. There was no allegation in the pleadings of the intervenor of any transfer of property between the insolvent and the plaintiff, or that the latter was a creditor of Becker, or as such obtained a preference over his other creditors; nor did those facts appear from the complaint. The factor’s lien, as claimed in the complaint, was not based on any indebtedness of Becker to the plaintiff, but upon the alleged fact that the plaintiff had paid drafts drawn upon it by Becker, in the name of Tom Johnson, per Abe Becker, for the purpose of paying in part the purchase price for the horses consigned to plaintiff, as a factor, and had paid certain charges and expenses in connection with the consigned property, as consignee thereof. The payments mentioned in the complaint, in the circumstances therein stated, did not create the relation of debtor and creditor between Becker and the plaintiff, unless for any bal *527 anee of the alleged advances and expenses, which might remain unpaid out of the proceeds of the sale of the horses by the plaintiff. Re Joseph P. Murphy Co., 214 Pa., 258, 5 L. R. A. (N. S.), 1147. The lien was not claimed on account of any preexisting balance of account in favor of the plaintiff, nor did it appear that any such prior claim existed.
Decided February 13, A. D. 1912.
Behearing denied April 8, A. D. 1912.
The plaintiff’s claim for reimbursement out of the proceeds of the consigned horses, for its advances made and expenses incurred, as alleged, in the relation of factor and consignee, on account of that consignment, did not put it in the attitude of a creditor of the insolvent, seeking a preference, within the meaning of the bankrupt act. Jaquith v. Alden, 189 U. S., 78; N. Y. County Bank v. Massey, 192 Id., 138; Richardson v. Shaw, 209 Id., 365.
The amended petition of intervention was on all points radically insufficient; and, as its material defects were not aided by the answer and replication, it was not error to exclude the intervenor from' participation in the trial. The judgment involved in each appeal should be affirmed.

Affirmed.